Mr. 'Chief Justice Sharkey
delivered the opinion of the Court.
This bill was filed by Hooe in his lifetime, in the vice-chancery court, to compel respondent to convey the land therein mentioned to complainant.
The record in the case contains near six hundred pages of manuscript, closely written, made up mostly of the evidence of the case, which, besides the depositions of many witnesses, consists of a lengthy and almost continuous correspondence, which was kept up for several years. It is impossible that we can do more than advert to a few of the leading features in the case, as disclosed by this mass of matter, not the most satisfactory, and give the impressions left upon the mind by the examination.
The foundation on which the trust is sought to be established, is an alleged agreement between complainant and respondent, *55 that the latter should invest the funds to be sent for that purpose in lands in Mississippi and Alabama.
Hooe was a citizen of Yirginia, and so was Harrison until the latter part of 1831. Hooe was wealthy, and the respondent, who was in limited circumstances, married the daughter of Hooe, in 1831. By the advice of complainant, as it is alleged, respondent agreed to come to Alabama, and examine and endeavor to acquire lands for the complainant, in part, in the country which had been recently purchased from the Choctaw Indians. The complainant furnished respondent Avith a sum of money ($400) and other requisites for the journey, and placed in his possession sixteen slaves, taking a receipt for them, the terms of which are unknoAvn, though it was probably intended by Hooe to enable him to establish a loan of the slaves, in case of necessity. The respondent insists that it was an advancement.
The allegations of the bill, as respects the agreement to invest money for complainant, are denied. The receipt of considerable sums of money at different times, is admitted, but it is insisted that they too were intended as advancements, to be invested for the sole benefit of respondent, for the purpose of securing a home for himself and family, and for laying the foundation of a future fortune.
The defendant left Yirginia with his family, and, after having stopped some time at Huntsville, located in Pickens county, Alabama, Avhere he laid the foundation for future acquisitions of a large body of land. Not very long aftenvards he commenced an examination of the surrounding country, Avith a vieAV to other locations, all of Avhich he did under the advice of the complainant. The letters Avhich passed, prove conclusively that the defendant had no means of his own. He made frequent calls for small sums to defray current expenses, and received them from complainant. The letters of complainant abound in promises of money to aid defendant in his views, to such an extent as might be necessary. The land on which Harrison settled, had not then been brought into market. The pre-emption laws, however, conferred certain privileges on actual settlers, and by making a settlement of his oAvn, and by securing the rights of *56 others, he expected ultimately to acquire title to as much land, around his settlement, as he desired. Money was not wanted immediately, and the promises of complainant were made in view of the approaching land sales, or when the land could be entered.
After the respondent had made his settlement in Alabama, his attention was directed to land on the Noxubee river, in Mississippi, about eight miles from his place in Alabama, and he became desirous of securing a location here also, with a view, no doubt, to further acquisitions around it. As the respondent was dependent on complainant for means, and disposed, no doubt, to pay great deference to his opinions, he disclosed his views fully in reference to his plans, and the advantages of the country, and value of the lands. The Noxubee lands occupy a prominent place in the correspondence. It was not very long before the respondent acquired a foothold there, by the purchase of one or two Indian reserves.
As the necessities of respondent required, in the accomplishment of his objects, the complainant made remittances to meet them.
The complainant had, in the mean time, been induced by the favorable accounts given him, to desire a location in the vicinity of the respondent, and had expressed this wish, and his intention on the subject to Harrison. That such was a part of his original scheme when he advised Harrison to leave Virginia, is by no means certain. Probably this desire was superinduced by the accounts which he received as to the value of the land and its product, and the field for speculation opened to his view in this new region or country. This, however, is an immaterial cir-' cumstance, so far as it may influence the trust. It is immaterial whether he originally entertained the design of having land purchased for him or not. If, after Harrison had pointed out the advantages, and proffered his aid, Hooe furnished him with money to be invested in land for himself, it is still a trust.
The leading objects of each of the parties must be kept in view, as gathered from the correspondence, in order that we may be enabled to arrive at a just conclusion on the particular matter *57 in controversy. Hooe was a man of great wealth, residing in Virginia. It is intimated that he was opposed to the marriage of Harrison with his daughter. The marriage having taken place, however, his feelings evidently changed. All his letters are of the most friendly character. Indeed, they manifest the kindest parental feeling. Harrison was poor, and had moved to a new country at the suggestion of Hooe. He of course required, and had a right to expect, aid in his enterprise. This was promised by Hooe in almost every letter. His intention to bestow liberally is manifest, and if he did not intend to give Harrison a fortune, he certainly intended to place at his command sufficient means to lay the foundation of a fortune. His profuse promises were soon followed by liberal advances, to suit Harrison’s wishes. With a fortune at his command, he seems to have enjoyed a pleasure in being able to afford the means of placing his son-in-law in a like condition. That much of the money remitted was intended as advancements to Harrison, cannot be questioned. His good feeling was fully reciprocated by Harrison. Each seems to have been desirous to serve the other; they mutually sought to preserve each other’s interest; not doubting but they could ultimately arrange the product of their enterprises to suit the views of both. The letters of Harrison would induce the belief that he was acting with the design of leaving every thing at the discretion of Hooe; the letters of Hooe would induce the belief that his main object was to serve Harrison. They mutually reposed the most unlimited confidence in each other, and it is therefore difficult to define their rights, as their intentions were not declared with certainty. With Harrison, there was evidently a leading object, it was to secure a home, surrounded by a handsome landed estate; it was Hooe’s object, above all others, to aid in this design. Supposing this to be the object, it was natural that Harrison should have turned his attention to more places than one. The land had not been offered for sale.— competition might defeat him in regard to his place in Alabama. To meet such an emergency, he became desirous to have a foothold in Noxubee. Indeed he expressed this to be his object in part.
But it is also clear that Hooe, in the mean time, had conceived' *58 the notion of having a place of his own in the vicinity of Harrison. A general intention to that effect was fully expressed to Harrison. Living in Yirginia, he could not well designate a particular place when he first made known his wish. After having expressed this wish, he informed Harrison that he would send out at least ten hands to be put on his place. He accordingly sent first twenty-three negroes, leaving it discretionary with Harrison where to locate them, the profits of the labor of the slaves to be divided between them. He afterwards sent forty-eight slaves in the same way. It seems to be certain, too, that Harrison had made his purchases, prior to the fall of 1834, with the means furnished by Hooe, and we are now speaking of events, all of which occurred before that time. It is certain that Hooe had remitted large sums of money to be invested in land, part for Harrison and part for himself. We think, then, we cannot be mistaken in taking the leading object of both parties, first to secure an estate for Harrison, such as he desired, in magnitude and location; not a single section, as is now pretended, but as many as he had indicated a wish to procure; and in the second place to secure a place for Hooe. But we do not think the evidence will support the conclusion that Hooe intended to advance money to engage in land speculations generally, over and above the amount that might be necessary to secure a place for a residence. He spoke frequently of Harrison’s procuring a handsome-estate, enough to work two hundred hands on; 'but his remarks on that subject evidently referred to the place in Alabama. He no where spoke of the propriety of his having more places than one. On the contrary, when he expressed a desire that Harrison should have such a place in Alabama, he at the same time expressed his own desire to have a similar one on the Noxubee.
Harrison’s first choice was the place in Alabama, or Prarie Place, as it was called; that is evident. His efforts were directed mainly to secure that, and his object was accomplished before Hooe came out in December, 1834. Keeping this important point in view, we are to endeavor to ascertain the intention of the parties, as to the location for Hooe; and we must endeavor to ascertain their intentions during the existence of their friendly feelings.
*59 Four quarter sections of land are sought to be recovered by this bill, to wit: the north-west quarter and south-east quarter of section thirty-three; the south-west quarter of section thirty-four, and the south-east quarter of section thirty-two, in township fourteen, range eighteen. Some other small parcels were originally involved, but they have ceased to be the subject of controversy, as they were not devised to the present complainant by the will.
All of this land, except the south-east quarter of section thirty-three, was purchased by Harrison at different times in 1833 and 1S34, and before the land sales in December, 1834. In the bill, there are many special interrogatories propounded, and amongst others, the respondent is asked if he did not purchase the lands above mentioned, with funds of complainant. These interrogatories are not specifically answered, as they should have been, but still it is insisted that they are answered. The answer is unnecessarily prolix, and it is argumentative. As regards this interrogatory, not to mention others, it is evasive. Whilst the respondent admits the receipt of a large amount of money, he insists that it was an advancement, except about $2985. The conclusion is irresistible, that the land in dispute was purchased with money furnished by Hooe, and if so, prima, facie, a trust resulted for his benefit. The law will presume such to have been the intention of the parties. A resulting trust can be established only by giving to the acts of the parties a fair and just interpretation, with a view to arrive at their intention, the object being to carry out the intention. But its existence may be rebutted by circumstances preponderating towards a different intention. It is a very common mode of defeating a trust to show that an advancement was intended, when the relation of the parties is such as to give plausibility to the defence. The relationship existed in this instance, and the pretensions of the respondent are powerfully fortified by the repeated declarations of the complainant. But whilst it is very certain that a large advancement was intended, it is equally certain that all the money sent was not so intended. Hooe intended to acquire a place near Harrison, Harrison intended to aid him in that view. *60 Part of one of the remittances was expressly designated for that purpose, and others evidently destined for the same purpose-Was the Noxubee reserve, being the name of one of the quarter sections, and the lands around it, intended for Hooe 1 That is the question.
Let us again advert to what seems to have been the leading objects of the parties. Harrison was to be provided for; his first choice was the Alabama place; in that he might be defeated; he therefore obtained an interest on the Noxubee. Next to this, Hooe was to have a place near Harrison, sufficiently near to be under his immediate superintendence, and the profits of this place were to be equally divided. When Harrison secured his place in Ala ama, the great object was accomplished. The secondary object was also accomplished if the Noxubee place was to be appropriated to Hooe. Whether that was originally intended for Hooe or not, does not seem to be material. Hooe certainly had a resulting trust in part of the land purchased by Harrison, who took all the titles in his own name. It was competent for the parties to designate the part to which Hooe’s interest should attach, after titles had been acquired. This was only to designate the part which was subject to an existing trust.
Now, in solving the question we have just propounded, to wit, was Hooe’s location to be on the Noxubee I let us notice some of the circumstances which seem irresistibly to tend to an affirmative answer.
The subject of a purchase for Hooe was mentioned at an early period in the correspondence. As early as July, 1832, Harrison regretted that he had not been permitted to purchase a reserve for Hooe. In May, 1833, Hooe expressed a desire to move some of his people out near Harrison. In August., 1833, Hooe made a remittance of $2000, with express directions that two eighty acre reserves should be bought and managed by Harrison, as he would his own. In October, 1833, he informed Harrison that he had obtained a loan of $3000, to be invested in land in his (Hooe’s) name, and that he had made arrangements for a further sum of $5000. In the same letter, he directed Harrison to commence building as soon as he had made purchases, for the *61 accommodation of the hands he intended to send. In November or December, 1833, he sent out twenty-three slaves, in accordance with his previouslyexpressed determination. Harrison had, in the mean time, commenced building on the Noxubee place, and placed the slaves there when they came. We may here pause for a few remarks. Hooe certainly intended that the buildings should be put up, and his slaves'located on his own land, and Harrison then as certainly, by his acts, designated the Noxubee place as Hooe’s. But to proceed. Hooe, in a letter of November, 1833, spoke of sending out the hands, and, with a view to their location, asked Harrison if it would not be better to buy out the other half of a reserve, the half of which he already owned on the. Noxubee, and settle them on it. He .here indicated very plainly his preference of a location, and Harrison acceded to that preference by putting the negroes on that place. In a subsequent letter, Hooe suggested the propriety of building cabins on the adjoining lands to keep off competition. , He looked, evidently, to the acquisition of a much larger estate. In November, 1833, Harrison wrote to Hooe on the subject of the Noxubee reserve, stating that he expected to put Hooe’s hands on it, and, if he wished, would convey to him. This was after he had been directed to buy on the Noxubee; and it seems that Hooe approved of his proposition. All the hands subsequently sent by Hooe, forty odd in number, were put on the same place. Harrison lived on it part of the time, and continued to make improvements with Hooe’s force. Three eighths of a section of the Noxubee place had been purchased by Harrison, in his own name, from Grant, who was examined as a witness. He understood that Harrison lived on it as the agent of Hooe; that after he acquired his titles in Alabama, he spoke of it as Hooe’s place. Other witnesses testify to the same effect. In November, 1833, Harrison wrote that he had purchased an entire eighth, part of which he owned before, and expected to put the hands to be sent, on it. He also informed Hooe that by doing so, he (Hooe) might add to it one hundred and sixty acres at $ 1.25 per acre, according to a regulation of the land speculators. He was also on a bargain for another eighth, to be laid adjoining. In one *62 of bis letters he said, as soon as the negroes come out, he would get Albert (his brother), and Foote to examine with him the several places he had bought, and advise which was the best to put the negroes on; he was in favor of the Noxubee place. Here was a clear indication that the place he might put the negroes on was to be Hooe’s. That the title might be in his name, does not seem to have been an obstacle. At this time the Noxubee place contained one hundred and sixty acres; he afterwards added to it.
In December, 1834, Hooe came to this country to attend the land sales at Columbus. Harrison attended with him, and being better acquainted with the land, purchased largely for him around the Noxubee place. Thus it seems that Hooe was but carrying out his plan of a large place. Harrison did not then inform him that he claimed as his own the land before purchased on the Noxubee.
After Hooe left the country, Harrison continued for several years to live on the place, and was regarded by every body as agent. But after a few years had elapsed, he advised that an agent should be sent out from Virginia to take charge of the place; and accordingly one was sent, to whom he delivered an unqualified possession, without making claim to any of the land. This, to be sure, is not conclusive against him, but it is a circumstance entitled to much weight.
It seems that Hooe instituted suit, in Alabama, for the land claimed by respondent there. In his answer to tile bill, Harrison admits that he received money to be invested in land, but insists that it was invested in Mississippi. It should be remembered that part of his right in Alabama was acquired by virtue of a pre-emption in favor of Hooe. So far as that is concerned, the title, the legal title we mean, must have been in Hooe; and yet it only proves what we have said, that their combined efforts were directed to secure a place for Harrison as the first object. The form of the title was regarded as an immaterial matter. If, as his answer states, he had invested money in Mississippi for Hooe, he'should be able to designate the place. True, he says in his answer here that he purchased in Octibbeha county. He *63 purchased but a small quantity there, and that too in his own name; and besides, Hooe had given his preference to the Noxubee place. He wished to be near Harrison; the Octibbeha lands were at some distance. He had been explicit in his direction that part of the Noxubee place should be purchased for him. After his hands were placed there, he approved of the selection, and treated it as his own, when he was here. In this place we may notice a circumstance entitled to some weight, as disclosed by the testimony of Foote. When about to leave this country, Hooe rode out in company with Harrison and the witness to select a building spot. The two differed somewhat in their views as to the location. Hooe observed, I do not know that you should have choice in a site for my house, for I thought you intended to take the Prarie place (the Alabama tract). Harrison said he did not know whether he was to have all the Prarie place; to which Hooe replied that he intended to give him a good landed estate. Here was a distinct claim, an act of ownership by Hooe, and an acquiescence by Harrison. This proves, moreover, that Harrison considered his right as very much a matter at Hooe’s discretion. His letters of a late date indicate the same thing. He spoke of a rumor that was in circulation that Hooe did not intend to do as much for him as he had been induced to expect. Against such a determination he remonstrated, and urged the justice of his claim, as arising from the labor and trouble he had bestowed in acquiring the land. This is inconsistent with his present pretensions.
The foregoing are not a tithe of the circumstances which lead us to believe that if the purer intentions of the parties had prevailed, and they had settled their respective rights before any rupture of feelings took place, the land in Alabama would have been assigned to Harrison, and the Noxubee place to Hooe.
Much reliance has been placed on a settlement made between the parties, in which Harrison surrendered certain land titles, taking therefor a receipt. This is entitled to but little weight. Hooe was evidently much dissatisfied, and said he would not submit to such a settlement. He did not receive the titles surrendered in full discharge, and is therefore not concluded.
*64 There is one of the quarter sections in dispute, which it is said stands upon a different ground, to wit, the south-east quarter of thirty-three. That was purchased by Harrison in his own name, and, as he alleges, with his own money, in the year 1835, after Hooe had left the state. The answer states that respondent wrote to Hooe for the money to purchase this land, but it was not sent in time, and Williams, being determined to sell, respondent purchased, paying one half cash, which he borrowed of B. A. Harrison, as appears. by his deposition, and for the other half gave his note, which he paid out of his crop of that year. We learn something of this transaction from Harrison’s letter of the 17th of May, 1835. In that he mentions a memorandum left by Plooe, as authorizing him only to sound Williams on the subject of the purchase. It seems, then, that there was no definite instruction to purchase. On the envelope he says that Williams had informed him of the sale of a little field over the river, a small part of the land. He agreed, if Williams could get it back, to take the whole at five dollars per acre, to which Williams acceded, half cash, and the balance in March thereafter. He says to Hooe, “I would like you to say whether I must buy it, provided he cannot get back the nine acres fraction.” He also expressed fears that Hooe would not like the arrangement, and says, “'Should it be the case, I’ll take the purchase, if perfected, on myself individually; your memorandum did not say purchase, but the mania for land has increased since your departure, which actuates me to purchase.” He further says, “If I take Williams’s land, I’ll have to get money of Albert until I can make some other arrangements.” In a letter of the 10th of June, he says, “I don’t know exactly what to do about the money of Albert,” and speaks of waiting to hear from Hooe on the subject. And he also says, “Shall I give Albert an order on you, or pay him myself?” We may here add, that the transaction as to the Williams land, throws additional light on the subject of the Noxubee place, and proves that Hooe was regarded as the true owner.
How this Williams place was ultimately paid for, we are not otherwise informed than by the answer. The difficulty is *65 attempted to be obviated by showing Hooe made a remittance on the receipt of Harrison’s letter, which was not received in time. The answer admits that he did forward a draft, which was, however, handed back to him in Virginia, bnt again returned to Harrison, accompanied by a general expression, “you may have use for it.” It is certain that Harrison intended to make the purchase for Hooe, if he should elect to take it. It is probable, moreover, that Hooe considered himself entitled to it; though it is not very certain that he ever refunded the money as a specific payment for that piece of land. As to this quarter section, it seems difficult to say that the trust had been established. The payment or advance of money must precede the purchase; a subsequent payment will not do to raise a resulting trust when the trust is denied. Botsford v. Burr, 2 Johns. Ch. R. 405 ; 3 Paige, Rep. 390; 2 Story, Eq. Jur. § 1201.
Decree reversed, and decree ordered for complainant.